Roger H. **FISCHER** and Grace Kissell, Plaintiffs,

v.

**DALLAS FEDERAL SAVINGS AND LOAN ASSOCIATION** and Guardian Savings and Loan Association, Defendants.

**Civ. A. No. 3–79–0565–R.**

United States District Court,
N.D. Texas,
Dallas Division.

June 18, 1985.

---

Frank Hernandez, Dallas, Tex., for plaintiffs.

G. Leroy Street, Geary Stahl & Spencer, Dallas, Tex., for Guardian.

Ralph E. Hartman and Charles L. Babcock, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., for Dallas Federal.

## MEMORANDUM OPINION

BUCHMEYER, District Judge.

This class action involves charges of "redlining."

The plaintiffs, Robert Fischer and Grace Kissell, allege that the defendants, Dallas Federal Savings and Loan Association ("Dallas Federal") and Guardian Savings and Loan Association ("Guardian"), have violated the Fair Housing Act, 42 U.S.C. § 3601, the Equal Credit Opportunity Act, 15 U.S.C. § 1691, and 42 U.S.C. §§ 1981 and 1982, because they refuse to make mortgage loans for the purchase of residential properties "in minority populated areas of the City of Dallas," and that such actions constitute what is sometimes referred to as "redlining."

Specifically, Fischer and Kissell assert that both Dallas Federal and Guardian refused to finance their purchase of a residence because it was located in a minority area of Dallas. They also seek certification, under Rule 23(b)(2), to permit them to represent the following three classes:

"(1) all applicants who applied for residential loans to the defendants where the property was located within a minority census tract and the loans were denied; and

"(2) all applicants who applied for residential loans to the defendants where the property was located within a minority census tract and the terms and conditions of the loans were so altered and limited as to make the granting of the loan and the funding of the loan economically unrealistic because of the location of the property; and

"(3) all potential applicants for residential loans who did not apply to Dallas Federal and Guardian because of their alleged practices and patterns of not granting loans in minority census tract areas of Dallas."

The purpose of this opinion is to resolve all pending class certification issues. It holds that:

(i) Kissell and Fischer are proper class representatives because they will "fairly and adequately protect the interests of the class."

(ii) It is not proper for this Court to certify the third requested class, i.e., "all potential applicants" who did not apply for residential loans in minority areas because of the alleged "redlining" practices.

(iii) It would be proper to certify the first two classes for purposes of injunctive relief only, but that no class for the recovery of damages should be certified in this case.

(iv) Kissell and Fischer are, therefore, certified as representatives of the first two classes in their claims for injunctive relief against Dallas Federal.

(v) However, no class will be certified concerning the claims against Guardian because the plaintiffs *have not* satisfied the numerosity requirement of Rule 23(a).

As the result of these rulings, the issues remaining for trial are the individual claims of Kissell and Fischer against both Dallas Federal and Guardian and the class claims for injunctive relief against Dallas Federal.

## 1. FACTUAL BACKGROUND

Both Grace Kissell and Roger Fischer are white. They are not married, but they have lived together since 1974. In 1977, they entered into a contract to buy a two-story, 9-bedroom, wood-frame house located at 3027 Routh Street, Dallas, Texas. The purchase price was $50,000, and the contract was subject to these conditions:

(i) the lot being 50' × 200' in size and the zoning being "general retail"; and

(ii) the purchasers being successful in securing an 80% conventional loan for a term of 25 years at a 9% rate of interest, plus an additional home improvement loan not exceeding $15,000.

At this time, the 67 year-old home was owned by Victoria Valdez; she lived there, but also used it as a rooming house, and all of her tenants were Mexican-American. The address, 3027 Routh, is in Census Tract 18, which is in a part of Dallas previously known as "Little Mexico." Although the neighborhood had changed drastically—from residential to commercial, with restaurants, retail shops, apartments and condominiums—the two-block radius around the house was 65% minority (1980 census).

In May of 1977, Kissell and Fischer contacted Guardian about the loan they needed. **It is disputed as to whether or not they actually made a loan application with Guardian.** However, Guardian advised Kissell and Fischer that it had policies against making commercial loans and against making residential loans in areas zoned "general retail." Apparently, Guardian expressed concern that the house needed substantial improvements.

On May 5, 1977, Kissell and Fischer filed a written application with Dallas Federal to obtain an "80% loan" on the property at 3027 Routh—i.e., a $40,000 "conventional mortgage loan" at 8¾% for 30 years. They were notified that Dallas Federal would only consider a "60% loan"—i.e., one for $30,000 at 9½% for 20 years. There were also discussions about a home improvement loan which might, after needed repairs were made, qualify the property for an 80% loan. However, negotiations ended after May 24, 1977. Then, in December of 1977, Dallas Federal did make a mortgage loan on the property at 3027 Routh to Edward S. Hughes, for the same amount and at the same terms previously offered Kissell and Fischer.[1]

Dallas Federal claims that the physical condition of the property simply did not support the "80% loan" sought by Kissell and Fischer—and denies that it rejected the requested loan because the house was in a "minority area." Both Dallas Federal and Guardian deny that they engage in "redlining," and maintain that their policies in connection with residential lending fully complied with the Home Mortgage Underwriting Guidelines published by the Federal Home Loan Mortgage Corporation.

However, Kissell and Fischer claim that both defendants engage in "redlining," and that they were refused the loan because Dallas Federal and Guardian had policies against making residential mortgage loans in minority areas. They filed detailed complaints against both defendants with the Federal Home Loan Bank Board. For example, the charges against Dallas Federal include the following:

"Here are some of our findings regarding Total Residential Mortgage Loans in the reporting period 7–1–76 thru 12–31–76:

2.1) There are 199 Census Tracts in Dallas; 45 of these have 75%-plus minorities. Dallas Federal made loans in only 7 of these 45 areas.

2.2) Dallas Federal made 1080 loans. Only 13 were made in the 75%-plus minority areas; the rest were made in other Census Tract areas.

2.3) The average loan amount in the minority areas was $21,000.00; the average in the others was $43,424.00.

2.4) The principal amount of all loans was $43,697,000.00. $273,000.00 was utilized in the minority areas and all the rest—$43,424,000.00—occurred in the other areas."

This suit was filed on May 4, 1979. On December 3, 1980, the Federal Home Loan Bank Board advised Kissell and Fischer that "the Bank Board will take no enforcement action against the two associations in response to your complaint." On February 18 and October 26, 1981, this Court denied the defendants' motions to dismiss the charges made against them under the Fair Housing Act, 42 U.S.C. § 3601, the Equal

---

1. Hughes renovated the property for commercial use as business offices. He spent about $60,000 in doing this (but saved 15–20% of the renovation costs by doing some of the work himself). A subsequent appraisal estimated the value of the property at $245,000.00.

Credit Opportunity Act, 15 U.S.C. § 1691, and 42 U.S.C. §§ 1981, 1982.[2]

## 2. FAIR AND ADEQUATE REPRESENTATIVES

Rule 23(a) requires the class representatives to establish that they will "fairly and adequately protect the interests of the class." **Kissell and Fischer have, without question, met this burden.**

■ Their testimony at the class certification hearing demonstrated that both plaintiffs are very intelligent and very sincere,[3] and that this case is very important to them. Kissell has spent from 400–600 hours working on this case, and Kissell has spent some 75–100 hours.[4] Unlike most class representatives, Kissell and Fischer have also paid all of the expenses involved in the effort to maintain this suit as a class action.

■ There has been no direct assertion that Kissell and Fischer are not proper

**2.** The motions to dismiss the plaintiffs' claims under the National Housing Act, 12 U.S.C. § 1701, Executive Order 11063, 42 U.S.C. § 1983, and the 13th and 14th Amendments were granted.

**3.** When Kissell and Fischer were unable to buy the house at 3027 Routh, they moved into another minority (Mexican-American) area nearby on Carlisle Street; at that time (1978), there were only two other whites living in this neighborhood.

**4.** Fischer is an architect with the Oglesby Group; Kissell works for Omni Plan Architects. They spent numerous hours examining records, researching facts and assisting their expert witness in this case; and, they prepared many of the exhibits (maps and charts) introduced in evidence at the class certification hearing.

**5.** In the 1980 census, the United States Census Bureau—recognizing a societal change with numerous persons living together without being "officially" married—counted not only persons who were "Single" and "Married," but also "*Persons of Opposite Sex Sharing Living Quarters.* The acronym is *POSSLQ* —and, of course, is pronounced *possle-kew.* It has been suggested that, although the source was stunningly unlikely, this was the *Very Word* that society had been looking for to describe these relationships: *POSSLQ.* Precise, businesslike, nonjudgmental. And, in its own way, sort of poetic, too:

class representatives because they are not married. However, the defendants' briefs make references to the fact that the plaintiffs are "an unrelated Caucasian couple who at all times material to this suit have shared living quarters." Accordingly, this Court specifically holds that the fact that Kissell and Fischer are "POSSLQs"—*Persons of Opposite Sex Sharing Living Quarters* [5]—does not prevent them from fairly and adequately representing a class in this case. **Indeed, because of the matters just discussed, Kissell and Fischer are the best class representatives in any class action which this Court has encountered.**

## 3. POTENTIAL APPLICANTS

■ However, it is not proper for this court to certify the third class sought by the plaintiffs: "all potential applicants" who did not apply to Dallas Federal or Guardian for residential loans because of their alleged "redlining" practices.

> "There's nothing that I wouldn't do
> If you would be my POSSLQ.
> You live with me, and I with you,
> And you will be my POSSLQ.
> I'll be your friend and so much more;
> That's what a POSSLQ is for.
> "And everything we will confess;
> Yes, even to the IRS.
> Someday, on what we both may earn,
> Perhaps we'll file a joint return.
> You'll share my pad, my taxes joint.
> You'll share my life—up to a point!
> And that you'll be so glad to do,
> Because you'll be my POSSLQ.
> "Come live with me and be my love,
> And share the pain and pleasure of
> The blessed continuity,
> Official POSSLQuity.
> And I will whisper in your ear
> That word you love so much to hear.
> And love will stay forever new,
> If you will be my POSSLQ."

In the October 1980 issue of Saturday Review, *Thomas H. Middleton's* language column attributed this poem to *Dero Saunders,* printed in a Dartmouth ex-students newsletter. But *Charles Osgood* attributed the word POSSLQ to *William Rukeyser* at *Money* magazine, and Osgood added the poem quoted above in his book "There's Nothing That I Wouldn't Do If You Would Be My POSSLQ" (Holt, Rinehart & Winston 1981).

This proposed class of potential applicants for residential loans in minority areas is purely speculative. The number and the possible membership of such a class cannot be identified, or even described in such a way as to make a class action meaningful. See *Rappaport v. Katz*, 62 F.R.D. 512 (S.D.N.Y.1974); *Chaffee v. Johnson*, 229 F.Supp. 445 (S.D.Miss.1964), aff'd, 352 F.2d 514 (5th Cir.1965), cert. denied, 384 U.S. 956, 86 S.Ct. 1582, 16 L.Ed.2d 553 (1966); *Harris v. Dumont Company, Inc.*, 61 F.R.D. 423 (E.D.Pa.1973); *Quigley v. Braniff Airways*, 85 F.R.D. 74 (N.D.Tex. 1979).

Moreover, the certification of such a class of "potential applicants" is unnecessary. Any injunctive relief obtained by Kissell, Fischer and a more limited class— i.e., of persons who, in fact, applied for loans—would equally benefit the amorphous "class" of potential applicants. And, as next discussed, it is not proper to certify a class action for damages in this case. See *Walker v. Robbins Hose Fire Company No. 1*, 76 F.R.D. 218 (D.Del.1977).

### 4. INJUNCTIVE RELIEF ONLY

■ The complaint seeks $25,000 in actual damages for Kissell and Fischer and at least $500,000 in exemplary damages for the named plaintiffs "and on behalf of the members of the class." However, in this case, it would not be proper for this Court to certify a class for purposes of damages, as distinguished from injunctive relief.[6]

In order for damages to be determined for each member of a class in this case, there would have to be a separate and time-consuming inquiry into each of the loans, applicants, and residences involved. For example, a particular "class member" would not be entitled to damages, either actual or punitive, if the individual was not qualified for the loan, or if the condition of the property caused the loan rejection. In addition, other factors—such as the intended use of the property, the zoning restrictions, whether financing was available elsewhere, etc.—would have to be considered with respect to each loan in order to determine if that particular loan was rejected for improper reasons (and, if so, what damages were sustained by the particular applicant).

Because of this, class treatment of the claims for damages would not advance "the efficiency and economy of [this] litigation, which is a principal purpose" of the class action procedure. *General Telephone Co. v. Falcon*, 457 U.S. 147, 159, 102 S.Ct. 2364, 2371, 72 L.Ed.2d 740 (1982); *Vuyanich v. Republic National Bank of Dallas*, 723 F.2d 1195, 1199, 1200–01 (5th Cir.1984), cert. denied, 105 S.Ct. 567, 83 L.Ed.2d 507 (1984). In contrast, since the problem of countless mini-trials is not present with respect to the claims for injunctive relief, this is a case in which class treatment of damages should not be permitted—but in which class treatment of the issues of injunctive relief is appropriate.[7]

For example, in *Rice v. City of Philadelphia*, 66 F.R.D. 17 (E.D.Pa.1974), the court was confronted with this identical situation. The plaintiffs sought injunctive relief and damages because of the alleged illegal detention of persons charged with crimes, and delays in arraignments, by the City of Philadelphia. In certifying a class *only* as to "issues relating to injunctive and declaratory relief," the court stated:

"Defining a class as consisting of all persons who have been or will be affected by the conduct charged to the defendants is entirely appropriate where only injunctive or declaratory relief is sought. Indeed, the principal beneficiaries of an injunctive decree would seem likely to be those class members whose rights have not yet been violated. But the proposed class definition is clearly unsatisfactory where damage claims are asserted. Per-

---

**6.** Rule 23(c)(4) provides that a class may be certified as to certain issues, and not others.

**7.** Obviously, in a class action for injunctive relief, the individual plaintiffs—Kissell and Fisch-

er—could still, *if they are successful*, obtain individual damages, as well as costs and attorneys fees in pursuing the class action to enjoin the alleged "redlining" practices.

sons whose rights have not yet been violated cannot very well obtain damages. Moreover, the definition is too broad, since it purports to include all persons whose rights have ever been violated in the past, in the respects complained of. If for no other reason than the statute of limitations, this definition would be unacceptable.

. . . . .

"The real issue, in my view, is whether this is the kind of case in which claims for damages are appropriate for class action treatment. It is quite true, as plaintiffs point out in their brief, that damages may be awarded as ancillary or incidental relief in a (b)(2) class action for injunctive or declaratory relief. But the cases in which this has been permitted appear to be cases in which the award of damages flows automatically from the grant of injunctive or declaratory relief, and in which the damages are subject to ready calculation on the basis of a formula or principles uniformly applicable to the class. . . .

"In the present case, not only would the calculation of the amount of damages depend upon the individual facts of each claimant's case, but virtually all of the issues would have to be litigated individually in order to determine whether a particular alleged class member was entitled to any damages at all. Each claimant, in order to obtain the benefits of the class suit, would have to establish his membership in the class (i.e., that his rights were violated).

"Of perhaps greater significance, the issues involved in determining whether the plaintiff class is entitled to injunctive or declaratory relief are simply not the same issues involved in determining whether individual members of the class may be entitled to damages. There could be many reasons for denying injunctive or declaratory relief which ought not to have the effect of preclud-

ing particular class members from obtaining damages." (66 F.R.D. at 20.) Therefore, the court concluded that "in short, it is difficult to perceive any advantage to the plaintiffs in maintaining this action as a class action on damage issues," as distinguished from a class action to obtain injunctive relief. See also *Battle v. Pennsylvania*, 629 F.2d 269, 271 at footnote 1 (3rd Cir.1980); *Rivera v. Ballard*, CA 3–79–0874–R (unpublished opinion by this Court, dated September 21, 1983, in which a class action was certified for purposes of injunctive relief only).[8]

### 5. CLASS CERTIFIED: DALLAS FEDERAL

In this case, although a class will not be certified as to potential applicants or as to damages, it is appropriate to certify Kissel and Fischer as representatives of the first two classes they seek—applicants for residential loans in minority areas who were refused loans or offered such unrealistic terms that the loans were not feasible—but only for the purposes of injunctive relief, and only as to the defendant Dallas Federal.

### a. *Members of the Class*

There was conflicting evidence as to whether or not the property which Kissell and Fischer wanted to purchase (3027 Routh Street in Census Tract 18) was in a "minority area." The complaint first describes the class as persons who have attempted to secure financing in "minority populated areas." Later, it alleges that the defendants engage in "redlining" because they do not make loans "in the 45 areas in the City of Dallas census tracts that have a minority population of 75% or better."

Dallas Federal, therefore, contends that the plaintiffs are not members of the requested class because Census Tract 18 was not 75% minority. The evidence did show:

---

**8.** In *Laufman v. Oakley Bldg. & Loan Co.*, 408 F.Supp. 489 (S.D.W.D.Ohio 1976) and 72 F.R.D. 116 (S.D.W.D.Ohio 1976), the district court refused to certify a class action in a "red-lining"

case. However, it does not appear that the question of certifying a class for purposes of injunctive relief, instead of damages, was considered. See 72 F.R.D. at 121.

... that Census Tract 18 was not 75% minority either in the 1970 or the 1980 census;

... that the racial composition of this neighborhood had dramatically changed by mid-1977 when the plaintiffs sought their loan; and

... that according to the 1980 census, of the 743 *housing units* in Census Tract 18 that are occupied either by owners or renters, approximately 70% are occupied by Caucasians, only 10% are occupied by Blacks and 20% occupied by Mexican-Americans.[9]

However, the evidence also established that, according to the 1980 census, the *population* of Census Tract 18 was 52% minority and that this minority percentage was higher in 1977 (and in the 1970 census). Moreover, the plaintiffs correctly contend that, although the neighborhood in Census Tract 18 was changing, it was "still perceived as a minority area," as demonstrated by the facts that:

... it had been part of the "Little Mexico" area;[10]

... the owner of the house at 3027 Fouth, and all of her tenants, were Mexican-American;

... the two-block radius around 3027 Routh was 65% minority in 1980 (and higher in 1977 and 1970); and

... their expert witness testified that, in his opinion, Census Tract 18 was a "minority census tract" because of its location.

■ Moreover, the term "minority area" is a relative one. The fact that the complaint alleges that the defendants did not make residential loans in census tracts that were 75% minority does not limit the other allegations in the complaint to that percentage. Under the class certification evidence, the term may—under all of the circumstances—mean an area which is more than 50% minority.

Therefore, the Court concludes that, *for purposes of class certification issues,*[11] Kissell and Fischer were applying for a residential loan in a "minority area" and they are members of the class they seek to represent.

### b. *Rule 23 Requirements*

The plaintiffs have satisfied all of the requirements of Rule 23(a) for the "injunctive relief" class; and, application of the *Falcon-Vuyanich* factors[12]—derived from *General Telephone Co. v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) and *Vuyanich v. Republic National Bank of Dallas,* 723 F.2d 1195 (5th Cir.1984), cert. denied, — U.S. —, 105 S.Ct. 567, 83 L.Ed.2d 507 (1984)—demonstrates that they are proper representatives of a class of persons who applied unsuccessfully for residential loans in minority areas. In particular:

■ (i) *Class claims "fairly encompassed."* Kissell and Fischer claim that they were denied a residential loan because the property was located in a minority area. The class claims are identical and, therefore, are "fairly encompassed" by the individual claims of discrimination.

9. The 1980 census shows that there were 1,069 housing units in Tract 18: 48 of these units were owner-occupied by whites, there were no black owner-occupied units, and 41 of these units were owner-occupied by Mexican-Americans. There were 673 renter-occupied housing units: 482 units were rented by whites, 79 units were rented by blacks, and 161 units were rented by Mexican-Americans.

10. One witness, Joe Gonzalez—who owns a restaurant on the same block as 3027 Routh—testified this area "was still a part of 'Little Mexico.'"

11. Of course, this issue must be resolved when the individual and class claims of liability are tried. This Court is precluded from making a determination on the merits of these claims in this class certification opinion.

12. See this Court's analysis of *Falcon* and *Vuyanich* in parts 3 and 4 of the opinion in *Falcon v. General Telephone Co.,* CA 3–75–403–R (N.D. Tex. Feb. 1985)

■ (ii) *Same interest and injury.* Under *Falcon* and *Vuyanich*, it is clear that Kissell and Fischer "possessed the same interests and suffered the same injuries" as the class—insofar as injunctive relief is concerned.[13] Both the individuals and the class had interests in purchasing residences in minority areas, and allegedly these loans were denied because of the location of the property. In this regard, it is clear that one whose loan application was denied "possessed the same interests and suffered the same injuries" whether the loan was denied outright, or whether it was "constructively denied" because the terms and conditions of the offered loan were "so altered and limited as to make the loan economically unrealistic." Therefore, contrary to the defendants' arguments, Kissell and Fischer may represent both of the first two classes that they seek—even though their application was not denied outright by Dallas Federal.

■ (iii) *Same evidentiary approaches.* The statistical evidence used to prove the individual and the class claims will be identical, so the class certification for injunctive relief will "advance the efficiency and economy" of this litigation. *Falcon*, 457 U.S. at 159, 102 S.Ct. at 2371.

■ (iv) *Standing to assert class claims.* Kissell and Fischer allege injuries as the result of their failure to obtain a loan. Therefore, they do have standing to assert the claims of the first two classes they seek. *Vuyanich*, 723 F.2d at 1200; *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1983).[14]

**13.** In terms of actual damages caused by the alleged "redlining" (or punitive damages that should be awarded), the injuries sustained by Kissell and Fischer would be different from other members of the class. Accordingly, as held above, it would not be proper to certify a damage class. See *Rice v. City of Philadelphia*, 66 F.R.D. 17 (E.D.Pa.1974).

**14.** The fifth *Falcon-Vuyanich* factor—whether a "footnote 15" exception exists for an "across-the-board" certification—need not be addressed since the class certification of the injunctive

## 6. CLASS NOT CERTIFIED: GUARDIAN

However, in this case, it is not proper to certify any class concerning the claims against Guardian Savings because the plaintiffs *have not* satisfied the numerosity requirements of Rule 23(a). See *Gilchrist v. Bolger*, 89 F.R.D. 402, 409 (S.D.Ga.1981).

■ The evidence at the certification hearing demonstrated that Guardian is a much smaller savings and loan association than Dallas Federal—and that, consequently, the number of loan applications from minority areas which were turned down by Guardian are not sufficient in number to meet the numerosity requirement. In particular:

... the number of loan applications turned down by Guardian from 1977 through 1980 in any area is extremely limited;

... of the 118 total rejections during this period, only 63 involved property in the City of Dallas; and

... only 9 loans were rejected by Guardian in Dallas census tracts which were over 50% minority.[15]

## 7. CONCLUSIONS

The plaintiffs Grace Kissell and Roger Fischer are certified as representatives of the following classes for purposes of injunctive relief only:

(i) persons who applied for and were turned down for a loan at Dallas Federal where the property was located in a minority area;

relief claims against Dallas Federal is proper. *Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740, at *footnote 15; supra*, footnote 12.

**15.** These 9 rejections by Guardian involved only 7 census tracts which were over 50% minority. The plaintiffs allege there were 45 census tracts in Dallas which were over 75% minority. They also presented sufficient evidence about the number and location of loans made by Dallas Federal to satisfy the numerosity requirement as to Dallas Federal.

(ii) persons who applied for a loan at Dallas Federal where the property was located in a minority area and where the loan was "constructively denied" because the terms and conditions of the loans were so altered and limited as to make the loan "economically unrealistic."

However, no class is certified with respect to Guardian.

The issues remaining for trial are the individual claims of Kissell and Fischer against both Dallas Federal and Guardian and the class claims for injunctive relief against Dallas Federal. **Nothing in this opinion should be taken as an indication that this Court has prejudged the merits of these claims.** Indeed, this Court recognizes that both defendants vigorously deny that they have ever engaged in any "redlining" practices—and they contend that their respective treatments of the plaintiffs' applications fully complied with the Home Mortgage Underwriting Guidelines. In addition:

> ... Dallas Federal argues that it did not "constructively deny" the plaintiffs application because a loan on the very same terms and conditions was made to Edward S. Hughes, who purchased the 3027 Routh property in December of 1977.
> ... Guardian denies that the plaintiffs ever made a loan application to with Guardian.
> ... Both defendants contend that the area in question, Census Tract 18, was not even a "minority area."

However, the plaintiffs claim just as vigorously that the pattern of lending by Dallas Federal and Guardian demonstrates that residential loan applications, including theirs, were denied because the property involved was located in a minority area.[16]

Therefore, the merits of these respective claims must be determined in trials of the individual and class issues.

---

**16.** This opinion does not rely upon the Plaintiff's Post Class Certification Hearing Supplemental Brief (and "Statistical Analysis"). Therefore, the motion of Dallas Federal to strike this brief is moot. The defendant's Motion to Preclude Expert Testimony by Lyke Thompson is denied.